and we will begin with Mr. Wolford. Please report. Good morning. Good morning. I appreciate the homework assignment from Thursday. We would have gotten it to you sooner if we could have. No, that's fine. That's not an issue at all. Mr. Wolford and your colleague as well, particularly given the number of issues that we were discussing, we recognize pertain to this case. While we set 15 minutes, we will be flexible. And to the extent the court continues to have questions, we'll just move forward. Thank you very much. I was advised to inform you, too, that I reserved three minutes for rebuttal. So I don't know how that plays out. So rather than walk through the brief, which is what I would often do in a situation like this, instead I'm just going to address your four points. If it seems to me that's what you're mostly interested in, let's do that. And if you have other questions. It's your position that after 61 days that you're entitled to lost profits? Yes. In the reply brief that I filed, I addressed pretty head-on this issue that, well, it's at least 60 days versus some other thing, that there's no outer limit. But the fact of the matter is that without court intervention on the deterrence period, Thuring has the right to go on on day one. The 60-day rule is a construct of the federal court in the Minard Run 1 case, based on Pennsylvania common law from the T.W. Phillips case. And so it's a forbearance period. A notice period. It's not a forbearance period. It's both. It's an accommodation and consultation period that actually came out of T.W. Phillips. But wasn't it really the custom and practice, if not the requirement, that a notice to proceed was going to signal your ability to then, the negotiations would be over and there would have been an agreement reached and you could then go on the land? Well, that's what the government did. That's not what the law requires. But wasn't that exactly what happened? But it's 60 days is what happened. Well, a notice to proceed would issue. A 60-day notice had to be given. But there was nothing set in stone that they had to act in 60 days. It was never an issue before Minard Run 2 because they never took this ridiculous amount of time. Well, but they never had a ridiculous number of applications either. It went off the charts. That's not entirely true, Your Honor. There was a period of time in the 1970s this actually came up in the Minard Run 2 case where they did have a ridiculous number of permits and they met the 60-day requirement. But here they didn't. Right. Repeatedly. Over and over and over. And there was a sea change that happened as reflected in the Minard Run 2 and Minard Run 3 cases. It was a sea change. It started in 2007. The wheeling ban went into effect in 2009, but it started in 2007. How is the district court wrong that in a situation such as this where there's been a delay in the enjoyment, if you will, of servitude or easement, that that delay without any destruction or damage to the underlying land, that you're entitled to lost profits? Why is the district court not correct in that? Because it's not an accurate reflection of Pennsylvania law. What case gives you that right? Two of the cases that I cited. One was called Esco. One was called Hillsdale. And there were others. One of the points that you wanted us to address is this damages issue. And if supplemental briefing is required, I'd be happy to go through some of those cases. But Esco, for example, there were two mineral owners using the same easement. One of the mineral owners interfered with the easement. The one that then could not get access to his minerals lost 14 days of downtime. They sued the other easement owner. The stuff was in place. It wasn't damaged. But the problem was they lost 14 days and lost profits. They sued them. It went up to the Superior Court case and was affirmed. In Hillsdale – But there was not just prevention there. Wasn't there damage? The damage was to the easement, not to the coal reserves. The damage award was based on the lost profits for 14 days. But it doesn't appear there that the defendant raised an objection to lost profits. And we have some other case law, including from the Pennsylvania Supreme Court, that we cited you to at Ray v. Schoenberg Coal Company, as well as the Deed case, that seemed to limit damages, assuming for a moment that we are talking about a cognizable action for interference with easement, and then the threats that you emphasize in your complaint constitute interference, which are a couple of issues we can come back to. But assuming it's cognizable, aren't damages for that type of action limited to rental value under a Pennsylvania Supreme Court case? No. Why not? The one case that you were citing for that measure of damages was Yuba, which is not a Pennsylvania case, and it's a takings case. And one of the issues that you've raised in your four points is this gravamen, or gist of the action, issue. And I think we need to be very careful about what the gist of the action is here. That's really a separate issue. That was looking at the contracts exception to waiver. Now we're talking about damages as a matter of state law. And there, while we pointed to the Federal Circuit takings case as an example of a sort of parallel action that's limited to rental value, we also pointed you to a Pennsylvania Supreme Court case, Robbie v. Schoenberg Coal Company, and Deed v. Ferris, a Superior Court case, where they took the approach that if there is a partial, total or partial loss of land for a limited period of time, the diminution in rental value is the measure of damages. Why shouldn't we apply that rule here as a matter of Pennsylvania state law in terms of the damages that would be available for taking this as an interference with easement claims? Right. Well, this raid was a coal mine cave-in case. And the question in that one was whether they wandered off the property intentionally or unintentionally. I don't know if they raised the issue of the full measure of damages, but there was no ongoing business concern. There was not a question about whether or not people lost profits at all. It's just a landowner that happened to have some coal next door, and that's what they used as a measure of damages. I would be somewhat resistant to looking at ancient Pennsylvania coal cases as authority for tortuous interference with a servitude, because that's not what happened in the cave. That's not what the cause of action was about. And this is why I think it is important, and I understand it's a separate issue, but you really need to figure out what the cause of action is. In that Pennsylvania Supreme Court case, there were various types of damage. Some was permanent and irreparable to the land, but some was simply excess. Some was the analogy to an easement here, and the court seemed to be quite explicit that there were only two measures of damages, the loss in market value for permanent damage and for temporary damage, a loss in rental value. Given that that's the same way temporary takings would be handled, as in Yuba, why shouldn't it be consistent across the board where what's at issue is the loss of access, the loss of use for a temporary period of an easement? It's wholly inconsistent with Hillsdale, escrow. There's a wharf case that I presented. But those cases did not have to do with the servitude easement situation at Yuba. They had to do with... You're relying upon a servitude and an easement, and so we're into that line of cases. They had to do with interference of an easement that affects an ongoing business operation and what is the appropriate measure of damages when you do that. And it wasn't by accident here that the Forest Service just happened to wander onto the property. And frankly, this is not just a normal easement case either. This easement is sort of an easement on stairways. Is it really an easement? Where is the easement set forth? It's a servitude is what it is, and that's why it was treated that way. So it isn't an easement. A servitude includes easements, and it includes profits, and it includes licenses. But an easement has to be for a space, doesn't it? And it allows the unfettered use. There's no definition of a space here, is there? Well, it includes an easement of some nature. So you own in fee the minerals on the same property. So you jointly own in fee the same property. If you have coal, it's a stratum. It's a split estate. It's not an easement, is it? But part of that ownership, it's... What's a right of access? It's valueless if you can't get on the property, right? So if you want to call it a right of access... Okay, but easement is a defined pathway. That's right. It's fixed by, you know, meets and bounds. It's in a deed. That's correct. There's no such thing here. It's not a typical easement situation. That's correct. Typically, you have an easement that's here to there. That's it. So it's a servitude. It is a servitude. And we got... There was some discussion about, in the district court case, whether or not that's an accurate description. That's actually the most accurate description. And, you know, had this issue been raised in mine run, too, for example, hey, you can't bring this cause of action because it's, you know, not an easement case, I don't think that would have gone very far. These cases have been around since Sharteers. The question that I think this case presents... Were damages sought in Sharteers? No, they weren't. And were they sought in Bell and Deep Lake? No, they were not. And injunctive relief was granted? Yes. And so the question is whether or not the remedy of compensation is also available. That it's the same cause of action. And so what I did then is I was trying to figure out why is this not in the tortury state when I was briefing the brief for this court? Why is this not in the restatement of torts? And as I researched this, I found out that they actually placed certain types of torts in the restatement of property. And in this case, it happens to be in servitude. And I actually talked to one of the restatement professors that was involved with it. And I said, why didn't you put this in torts, too? And it was Professor French. And she said, well, we just made a decision. Some of this stuff goes in property and some goes in torts. But if you look at the restatement that I cited in the brief, it's directly on point. Section 4.10 is directly on point. This is the tort. And the Pennsylvania courts never doubted that? Yeah. Expressly? Not that I'm aware of. But then when you look at the measure of damages... It's simply an argument, then. What's that? It's an argument. Well, it is an argument, but it's more than that. If you look at one of the cases where it was Devlin, when you get into the FCCA context, they looked at whether or not you have a uniform decision versus a state law decision. Well, the restatement is the uniform decisional law that you can rely on, just like they did in Devlin. They relied on the restatement of torts, as this is what the country has as a uniform standard. Well, the restatement of property would be the same in this context, if the court hasn't expressly adopted it. So it's your position that any time there is a delay after the 60 days, there would be a cause of action against the United States government for lost profits? That's sort of a hyper-technical way of approaching it. I understand. I think you're setting forth exactly what you want us to hold. I'm not accusing you of being hyper-technical. What I'm saying is there is a line. It's in the sand. It's 60 days. When the Forest Service engages in conduct that goes to 65, 70 days, nobody cares. Nobody's going to bring that cause to hand. What if there's a huge loss of profits during that time, and that delay? I mean, where do we draw that line? I can tell you it's not going to be, because these are conventional oil and gas wells. These are not unconventional. So they tend to be family-run oriented businesses. They're decent, hard-working people. Aren't you then getting into this discretionary exception, because you're really talking about, well, 5 days, 10 days, what are they doing? They've got to make a judgment here. They're dealing with it. I mean, isn't this the kind of situation that the discretionary exception is meant to address? Well, here's the problem, and once again, we've got to look at what is the conduct. Under the law, on day 61, During could have gone in. In fact, they did go in at some point, and they were removed physically. The law enforcement showed up and said, get off the property. Illegal. Totally illegal to do that. Well, the law enforcement, I mean, Forest Service has rights of arrest. They have criminal prosecution. Not for this. They shared the property. But even if, I mean, statute says that it's the discretionary exception, even if there's an abuse of that discretion. Maybe there was an abuse of the discretion. There has to be actual discretion in order to abuse it. They don't have the discretion. What was the mandatory nature of what they were doing? Wasn't this a negotiation period? They were talking about the roads. There was a lot of back and forth about the timber. During the 60 days, yeah. And this was a unilateral delay imposed by the Forest Service. They had no discretion to go out and arrest people. None whatsoever. Where is that? I don't find the 60 day requirement. Where is there any allegation or complaint that they were, that law enforcement appeared and physically removed them from the property? I would need to look at the complaint. I was on my way here this morning, and my client reminded me that that's in the complaint, so I assume that it's there. But that did happen. But whether it's that or just letters of a threat, even the district court found there's no material difference between threatening arrest and actually barring access. It's the same thing from a legal standpoint. So, I mean, it's one thing to have a physical impairment or interference. But what is your authority under Pennsylvania law that a threat of litigation? It's not a threat of litigation. They threatened to arrest them. So what you're saying is, and this is what the district court dealt with, she said, you don't have to get arrested in order to say that that's barring access. You shouldn't have to get arrested. And that's what they were prepared to do, and they were quite clear about it. I recognize the district court said that. Yeah. But under the FGCA, the United States has agreed to waive sovereign immunity and be liable to the extent that a private party would. So don't we need to look at the analogs of a private party threatening civil litigation? And does Pennsylvania recognize that as an interference with a servitude? It wouldn't be civil litigation. It would be false imprisonment. If a private party went out and grabbed somebody and locked them up, that would be false imprisonment. It wouldn't be a civil litigation. Civil litigation was actually the proper recourse that the foreign service decided not to choose. What is your authority that the threat of doing that constitutes interference, actionable interference under Pennsylvania law? I can brief that, too. I think if it's going to be false imprisonment, it would be the authority for that. That wasn't brief, because I didn't know that that was an issue on appeal, and that's not part of your court report. But do you agree that under 16 USC 559, the Foreign Service does have the right to make arrests? And under 36 CFR 261.1b, violations of rules and regulations are punishable by up to six months imprisonment. I mean, there are teeth in a lot of what the Foreign Service does. Is that not correct? What you're saying is correct, but I addressed this in the reply brief. They knew full well that the regulations didn't apply. I mean, you could read Minor Grunt 3. The regulations don't apply. So if the regulations don't apply, how can you arrest somebody for not following them? Well, Minor Grunt 3 said that, but that was well postdated. The thing is, they've known this since 1980s, actually prior to that. That's what Minor Grunt 2 was about. Well, the 1911 regulations apply to the one reserved right parcel. Yes. Right? And the Energy Act applies to the other three. Right. The Energy Act is a codification of the Minor Grunt framework. That's really all it does. Well, beyond notice, I mean, the next provision, subsection 4, also codifies that the Forest Service can have fair market value, can require fair market value, and the disposition of the timber be on terms that it approves. Right. We're starting to get into the weeds. And to get into those weeds, I would love to do that. We'd have to remanufacture. We could have a trial on this stuff. But what was really happening was they were creating sort of false interferences. They would say, all right, the fair market value is x. We want a contract that you're going to pay x plus 5, or 2x. We're not going to agree to that. It's like, well, then you can't go on the project. To the extent what you've alleged is disagreement and an impasse in the negotiations about the fair market value of the timber, or the timing for the issuance of a notice to proceed, or invoices for that timber, those are things that would seem to fall because of the Energy Act, subsection 4, as well as the 1911 regulations within the discretion of the Forest Service. During the 60 days, that's correct. And at the conclusion of the 60 days, if an accommodation hasn't been reached, the recourse is to go to court. That's the law. Why isn't it a legitimate recourse on the part of the Forest Service, given the other provisions that Judge Rendell referenced, for the Forest Service to say accurately that if you don't comply with these terms, that there are criminal sanctions available? Because that's not the law at all. That would be the same as a private landowner saying, you can't come on the property. And the Clearfield Trust case has been around for 50 years. Chartier says the same thing. The one thing you can't do is, as a surface owner, deny access, because that gives you veto power. Belden and Blake, same thing. Even if it's the government, you can't start imposing conditions on people as a means of preventing access. Even that kind of infringement, you're not allowed to do. But you're asking us to treat the threat of enforcement action that the Forest Service is actually authorized to engage in as an equivalent of a physical obstruction. They're only authorized to engage in arrest powers when someone's committed a violation of either their regulations or a statute. Bering didn't either. As a matter of law, they didn't either. They own the property. But based on your premise, on day 61, you could have gone in and gotten a mandamus, right? I suppose we could do lots of things. You could spend all the money in the world on litigation. The way that the construct is framed is that we're allowed to actually go on the property which we own. OK, but a lot of these things are subject to equitable principles. Injunction clearly available, perhaps mandamus. The question here is one of damages. If you didn't go in and seek an injunction or mandamus, and then you want damages, it's a different situation. It's a different situation. Well, they're all different situations. I suppose if we went on on day 61 and they were actually arrested and thrown in jail, we'd be here on a different tour because it would have been unlawful. And that would have been false imprisonment and false arrest and malicious prosecution and probably a few others. But that's not what happened. What happened instead was they threatened. And it was a very credible threat. They put it in writing. I remember I got a call from the US Attorney's office in Erie threatening that if Minard Run cuts down one tree, somebody's going to get arrested. So it was a credible threat. And people don't want to have to get arrested in order to exercise their rights. The way that the law works in Pennsylvania is after the 60 days, the Forest Service Are you saying you had the right to cut down the tree? Absolutely. Without permission? Yes, absolutely. Under the 1911 regulations, the Forest Service And to put in a new road after 60 days? Yes. All of that. And if you look at Judge McLaughlin's comments in the contempt proceeding, and you also then look back at Minard Run 1, you'll see that what I'm saying is correct. So we're trying to work out something with the Forest Service. But if it doesn't work out, the Forest Service has an obligation to go to court and say what they're doing is unreasonable, either because we don't have enough time or because we don't like where the wells are, whatever. That's their onus. Feldman Blake reaffirmed that. It came out of Chartier's. It's been around for 100 years. Instead, they invoked criminal law enforcement powers and said, if you go on the property, we're arresting you. They didn't have the legal authority to do that. So to say that, well, they have legal arrest powers, so that's OK, it's not OK because you have to have a violation of something first, whether it's a regular statute or something. We certainly said in Minard 3 that a notice to proceed could not be treated as a permit, that that could not be a precondition to access to mineral and gas rights. But the conduct of issue in this case was 2007, 2008. Yes. It predates Minard 2 and Minard 3. Should we take any consideration of the law not being necessarily clearly established within the Third Circuit at that time? It may not have been established clearly in the minds of the Third Circuit, but I lived through this. The Forest Service knew exactly what it was doing. The law has been clear since Chartier's. It's 100 years ago. It's been following the same practice since Minard Run 1. The issue in Minard Run 1 wasn't whether or not Minard Run had the authority to go on the property and start cutting down trees. It was whether or not the Forest Service was entitled to notice first. And the district court said yes, and 60 days is a legitimate amount of reasonable amount of time to get advance notice, and then you can work it out. If you can't work it out, then the Forest Service has to go to court, as they did in Minard Run 1. But this idea that all of a sudden in 2007 that they were confused about the paradigm that had been going on for decades and the practice that had been going on for decades and that 60 days really meant 60 days just isn't factually correct. Well, 60 days is a notice period, but in terms of the significance of a notice to proceed and whether that could or could not be treated as a permit, that was decided in Minard 3. Right, well, they created this construct in order to create the drilling bin, and here's how this worked. They knew that the notice to proceed was just a letter, but in order to trigger NEPA, and this was out of the Wisconsin Office of General Counsel came up with this plan. In order to trigger NEPA, you'd have to have a major federal action, but you can't have a major federal action if you don't have any discretionary authority. But that was the subject of a lengthy and very thoughtful opinion from Judge Ross. I understand that, but if you've got that- It's not that the argument that the Forest Service had such authority was a frivolous one, right? It was frivolous, because if you look at their own handbook, they knew better. This was a change that they made in 2007 based on OGC memorandum that was, I think, created at the end of 2006, which was contrary to one that had been around for two decades, maybe 1991, something like that. And so they were well-informed what was going on. They knew the custom. They knew the practice. They knew exactly what they were doing. And instead of having a friendly, cooperative relationship, they just decided, we don't like what's going on here. We're concerned about the extra drilling that's going on. And frankly, I think they're really concerned about unconventional gas wells coming in, which the stratum there doesn't really- the Marcellus isn't thick in this area, so that was sort of a false concern. But I think that's one of the concerns. So they figured out, we need to stop this. We don't want to exercise eminent domain. We don't want to have to pay for it. How can we do this? And this was the scheme they came up with. And it was overturned in minor run two, minor run three. We asked you to be prepared to address the significance of the Denton case that was issued by the Supreme Court recently. Yes. I had briefed previously that, as far as I was concerned, under Aikens, we had a special relationship and intention of conduct. So we didn't really have an economic loss problem anyway. What I think the Supreme Court case does in Dittman is it makes it even clearer that this idea that purely economic damages is unavailable in tort, that the economic loss doctrine was never intended to do that. I briefed that both in the original brief, where I basically made the same argument the employees made in Dittman. And then in the recent case, I think they just made it clearer. So they kind of followed my logic. But whether or not we had the second Dittman, the Supreme Court case in Dittman, I think we would have won. Because clearly, there's a special relationship here. I mean, the whole idea of the economic loss doctrine, there was a foreseeability issue, third party contract issues. And it was unfair to impose tort liability on somebody for something they didn't even know who these other parties were. They didn't know that what they were doing to this person would have an effect on a third person. That's what the economic loss doctrine was originally designed to deal with. That's not the case here. I mean, we had people that owned the same property, and they knew exactly what was going on. And they knew by barring access, they were preventing them from joining. Well, what about the scope of the waiver here under the FTCA? Why isn't Congress waived for money damages for injury or loss of property? Why isn't that a sort of federal version of an economic loss doctrine? That is, that there needs to be some physical damage to the property. Right. That was rejected by both Tri-State and Devlin, that very argument. And I think there was a Maryland DC court that had said that there needed to be physical impact based on the Ninth Circuit cases, Twombly and others. I would say the Ninth Circuit cases are sort of on their own footing. And frankly, they could get overturned. Because they're totally inconsistent with Tri-State. So for Tri-State, for example, you've got the recovery of attorney's fees. That's loss of money, expenditures of money. In Devlin, you actually had an expectation of getting a life insurance proceed. Is that property? And so if the Second Circuit and the DC Circuit both said, look, we're going to take an expansive view of what constitutes property, that's totally in opposition to what the Ninth Circuit had concluded in the fire suppression case. What do we make of the Supreme Court's footnote in Koshak that seems to be skeptical of the notion that economic loss alone would qualify, would be a cognizable claim? It starts off saying maybe there's a little skepticism. Maybe there's an issue here. But then it says we're expressly declining to evaluate this issue. So aside from the fact that it raised the issue, I don't think it provides much guidance. Isn't the injury here that is parallel to the attorney's expenditure in the other case? Isn't the injury here really delay and denied access? That's not really the injury. Then there's a consequential impact that would be lost profits. But the real injury or purported harm is a delay or denial of access. And I'm not sure if that's the type of injury or loss that is anticipated. There's two types of losses that I identified. And there's a few others. But two major types of losses. One is on a paying quantities lease, which is what was going on in lot nine, a lot of these leases, you have an obligation to continue to develop. So in that case, Dury was the lessee. And so in order to keep the lease alive, they actually had to keep developing property. They were interfered from doing that by the Forest Service. In order to keep that lease alive, they actually had to spend $150,000 to the lessor to keep the lease alive, because they were unable to meet their commitments. That's an out-of-pocket expense. That's consequential damages. The harm is denied access, really, isn't it? It's an out-of-pocket expense that was caused by the denial of access. It's very similar to the attorney's fees in the tri-state case. The attorney's fees was the actual harm. That was the actual expenditure. Well, this was an expenditure, too. I mean, they had to pay money in order to keep the business. And so in the other case, Devlin, I think, supports the loss of profits. Because in that one, they were looking at, well, what constitutes property for purposes of the FTCA? And they took a very expansive view. I mean, unlike the Ninth Circuit that says, well, it actually has to be the physical property, in this case, the trees, which I think is subject to being overturned if it ever goes up. Because it's totally at odds with an attorney fee recovery. And it's totally at odds with the recovery in Devlin. So you've got, currently, a split. The Ninth Circuit seems to be the outlier. And it seems to be limited to those firefighting cases because, frankly, I'm not sure why they're not contract interference cases. Because it was a contract between the state and the federal government. That's how they really should have been decided, in my humble opinion. So the trend seems to be, especially with the D.C. Circuit, that there is recovery for out-of-pocket expenses and for other forms of property that don't cleanly fit physical property. Well, if we rejected the Ninth Circuit's approach and went with that of the Second Circuit and D.C. Circuit, that only gets you past the threshold question of whether it's cognizable as money damages for injury or loss. We still have to deal with the damages question that may inform what the nature of this claim is under state law. If I understand you right, you're asking us to hold that a temporary interference with access to gas or minerals would qualify for far greater damages than a permanent injury to the real property, which would be measured under Pennsylvania law just by the diminution in market value of that property, right? I think your question depends on the facts of any particular case. But I am asking exactly what you said for lost profits. And whether you look at, in Devlin, they split out the uniform decisional view versus the state view. You're sort of going down the state path, which Devlin thought was the right way to go, by the way. And so if you look at the uniform view, I think then you go to the restatement of property servitude, section 4.10. And then you look at the damage section, which is 8.2. And it says compensatory damages, nominal damages, punitive damages. You can't get punitive under the FTCA. Frankly, in this case, I think if that were not the case, we might have even added that as a claim. So that's where you would look to see if, on a national basis, there is recovery here. But if you have clear direction from the Pennsylvania Supreme Court about that, as we seem to, I mean, Robbie itself indicates that the measure of damages for permanent invasion is decrease in fair market value of the property. So how would it make sense to allow far-ranging lost profits for a temporary prevention of access to minerals and gas that are fully available once that obstruction is removed? Well, like I said, I've given you two or three different cases where that recovery was permitted. And I do believe it's important to figure out what is the cause of action. If we're talking about a taking, there's a whole area of jurisprudence that deals with that, including measure of damages and that sort of thing. We're not talking about a taking. The United States government did not assert that it owns this property. If it did, that would be a different matter. We'd be talking about a taking, whether it became permanent or temporary. They knew full well that they didn't own this property. What they were doing was interfering with its use. That falls under the other cases that I've cited, such as Hillsdale, Escrow, and a couple of the other ones. And like I said, if you want a supplemental brief on this issue of damages, we can really dive into as many facts as we can in the case. One of the cases that you folks referred us to was a sewer pipe case that came out of Crawford County on this very same issue. And as I read your letter, it said, this only has for rental value. But I went back, and when I read the case, it looked like the plaintiff recovered for lost rents. In other words, they had an apartment complex that was constructive eviction because they couldn't flush their toilets. And now they were able to recover for the lost business profit of renting the facility. That's how I read it. So we'd have to go back in the archives to find out what the complaint actually said. But that's how I read it. It wasn't rental value. It was loss of rents. And if you look at one of the cases that was cited, it was a laundromat case. It was in Yuba. There was an argument that was made that there was a laundromat case and that the taking should only deal with the property value. And they said, no, no, no, that was an ongoing business concern, and you can get damages for that, too. And if you look at, I forget the name of the case. I'll tell you in a second. Kimball Laundry. So even in a takings context, and this was the argument that Yuba made, and the court rejected it because they said, well, you didn't have an ongoing business operation. You were sitting on your gold reserves. You had this negotiation thing going on, but you didn't actually have an ongoing business operation. But in Kimball Laundry, they did. And so even in that takings context, they said lost business profits is OK because you had an ongoing activity. That's what we had. Is it your position with respect to timber and road use that there's no regulatory authority on the part of the Forest Service? Yes. The outstanding rights, if you go back and read my round three, it's kind of unclear at first until you live with it for a little bit, and then you get it. Outstanding rights, when the United States acquired the property, the minerals had already been reserved to somebody else. So the person that sold it to the United States can only sell what they have. And in those cases, no regulations apply at all. And that's my round three says so, and so does the ANF handbook. But you don't dispute that the Energy Act applies, right? Well, it doesn't really provide for anything. Subsection 04 provides that the oil and gas estateholder has to pay fair market value or make arrangements for the disposition of timber that are approved by the Forest Service. I dealt with this issue below. It wasn't raised on appeal here. There's two sections in there. One of them deals with leaving the timber if that's one of the ways you can give the timber to the Forest Service. That's what Duran kept asking the Forest Service to do in this case, which I briefed previously. And we have an affidavit on file for that. But in response to Judge Serco's question, you don't dispute that that provision of the Energy Act does apply to outstanding estateholders. I don't believe it created a regulatory framework, as the question suggests. I do not believe that. The only regulatory framework is the agreed-upon regulatory framework. And I'll finish my answer when you have outstanding, there's no regulations. In reserve context, the regulations actually appeared in the deed. And that was the whole point, is that you would negotiate the deed. And this is the 1911 Secretary's Rules and Regulations. And they were pretty minimal. And basically, they said, if you cut down our trees, we get the value for them, or we get the trees themselves. Either is fine. But you can't then put a regulatory overlay on it and say, and you have to enter into a contract with us. And the contract has to say this, this, this. No, no, no. None of those regulations apply. But whether or not there are regulations that were promulgated pursuant to the statute, you agree that Section 226.04a and b, the statutory terms, apply to outstanding stakeholders, right? I'm not sure. This is another thing that needs to be briefed if we're going down that path. But what I briefed before was that, in our situation, this argument that the United States was making, that somehow the Energy Act brought in their ability to regulate timber contracting, in our situation, is not true. And I'd be happy to rebrief that. So does the Energy Act apply generally to all these activities? Sure. Was Congress's intent to start to regulate something that hadn't been regulated before under the WEEKS Act? No, it was not. You've made reference a couple times to the importance of identifying the true nature of the causes of action here. And in that regard, particularly given the demand for damages that exceed rental value of property, that go to lost profits, per se, why isn't this action properly characterized as a claim arising out of interference with contract? This really gets to the gist of the action doctrine of the Grobman. It's the same type of issue. If you look at the Dittman case, for example, Justice Saylor dealt with this very same issue. He was looking at, well, there is a contract overlay to the tort claims in that case. You've got employees of UPMC. They were required by their employment contracts to produce certain data, blah, blah, blah. And because they did that and UPMC didn't make good on the safeguards that they should have had, maybe this is a contract case. And he rejected that. And he said, because that's not really what the case is about. The case is about negligent handling of the data. The fact that there are some contract implications make it a hybrid, but that doesn't change the cause of the action. And other cases, whether it's the Dupree case, all of the ones that dealt with this issue sort of came down the same way, that the mere fact that a contract may be out there as a consequential damage issue, just like Tri-State, for example. You could say that Tri-State, well, here's a contract between the law firm and the party that recovered. So that's a contract action, but it's not. The mere fact that there's a contract out there does not change the cause of action. You have to look at what the cause of action is actually about. What the cause of action here is not whether or not the Forest Service took too long to review plans of operations. I mean, that's part of why it happened. But what it's about is they barred access to property that belonged to Doering illegally, and that caused harm to Doering. But we're looking at the nature of the tort action that is pleaded in the complaint. Right. And arising out of, we generally give a broad construction to that, where what you've, let's assume, for purposes of this question, that damages for a true interference with servitude or easement claim was limited to rental value. And this is a complaint that requests damages that would not be cognizable as that type of claim, that go beyond it to what could be claimed for interference with contract. Why, then, shouldn't we view this as being barred by the contract exception? There was no contract between Doering and the government. But that's not what the contract exception goes to. It goes to lost profits. So how far out do you go? So how far out do you go? And in Tri-State, they said, well, it doesn't capture train fees. In Devlin, they said, well, it doesn't capture the MetLife insurance contract. In any case, if you go out far enough, you could say, well, sooner or later, the whole reason that somebody's in the oil and gas business is because they want to sell it. Well, there's going to be a contract involved, and therefore, it's interference with contract. But here, that's the only damages claim. What's that? Here, that's the only damages that are claimed. It's only that economic loss, which sounds in interference with prospective economic advantage. Right. First of all, that's not true. We also have out-of-pockets, the $150,000 that they had to spend to keep the lease alive. And then secondly, with lost profits, if you can recover in Devlin for an expectation of being a beneficiary, you can certainly recover for lost profits. You weren't able to get because someone prevented you from getting at what you own, your own property. Well, that's a different question. The threshold question of cognizable injury for FTCA purposes, assume we get past that. We accept a position like the DC Circuit or Second Circuit. Then we're looking at, what is the state tort action that's been pleaded? And does that fall within an exception to the waiver of sovereign immunity? That's where the interference with contract question comes into play. And where, under Pennsylvania law, if we assume that it would otherwise be limited to rental value, and what you're claiming really looks like, smells like an interference with contract action under state law, then wouldn't this fall within the waiver exception for interference with contract action? It's not a contract action. This really gets to the gist of the action doctrine. And the dissent that I was talking about in, or not the dissent, but the concurring opinion, rather, in Dittman, the way that the judge looked at it, Saylor, hang on just a second. You said it's a Bruno, which is Pennsylvania law. Bear with me for a moment. OK. Bruno versus Erie Insurance. Yes, it's footnote three in the concurring and dissenting opinion of Justice Saylor, and that he dealt with this contract issue, and concluded that because he viewed it as a hybrid, and because it was in the restatement of torts, that this cause of action was in the restatement of torts for that reason, he came down on the side, since it's in the restatement, it's not a contract problem. And I would make the same argument. We're in the restatement of property servitudes. This specific cause of action is in there, for the same reason that Justice Saylor concluded it's not a contract problem. I would say this. And what Bruno says, it comes down to, under Pennsylvania law, it's the nature of the legal duty that was breached that determines whether it's a contract or a tort cause of action. It's the nature of the legal duty that was breached. The legal duty that was breached here was the duty of due regard under charters and projects. Should we be giving greater scrutiny to the nature of the claim where federal jurisdiction is at issue? That is, the scope of an exception to waiver, and whether the pleading is an attempt to evade that, or whether it's an attempt to evade exclusive jurisdiction of the Court of Federal Claims? I didn't plead this to evade anything. It's an interference with a servitude. It's recognized under Pennsylvania law. The question is whether there's damages here. And you're getting into sort of a Devlin question. Do you follow federal law on this? Do you follow state law on this? I think state law, the way that they evaluate it is element three and element six are related. I think that's probably the right reading. When I say element three and six, I'm talking about the six elements that came out of the Meyer case, where they broke down this. And Devlin, the Second Circuit says, we think that element three and element six are tied together. So you should really be looking at a state law issue and not so much at federal law for the loss or injury to property. Do you agree with the Fourth Circuit in Talbert as to what constitutes the gist of the action, that that's a question of federal law because it's going to questions of federal jurisdiction? Well, again, this is the Devlin case. And they talked about doing it both ways. And then they ended up doing it both ways because they couldn't decide. And so I'm happy to brief it because I think we win either way. I've tried to explain that if you do the uniform approach, you look at the restatement. I sort of chuckled when I read it. They started looking at other states. So they're trying to figure out what uniform federal law is. And they're looking at other states. And that doesn't really make much sense to me. You want to look at other federal law. But that's what they did. And so I figured, well, if they did that, then I can do that. And we'll look at the restatement of property. And then if you go to the state side, you're getting into escrow. You're getting into Hillsdale. You're getting into the other cases that I cited where it's recoverable. And one of the questions that when you talk about the takings measured damages is the rental value. There is no rental value. But the value of oil and gas reserves are pulling them out of the ground and selling it. Isn't that exactly the point, that the oil and gas, the mineral rights are still there. It's just a delay in accessing them. But there's harm that comes from that. So how long do we say is not harmful? Six months? A year? That is a good question. You were saying, well, 10 days or 30 days. Right. So we need to follow the law, which is 60 days, we should be able to go in and do it. That's the law. That's where the discretionary exception comes in. It can't be. It has to be a matter of give and take. It has to be a matter. They don't have the discretion to arrest people who are exercising lawfully their rights. They don't have that discretion. That's the point.  Or maybe they're abusing their discretion. No, they don't have the discretion. If your owner walks outside and a police officer comes over and arrests you for walking on the sidewalk, he doesn't have the discretion to do that. Well, it's threatening. They arrest you. That's what they were doing. Well, the affirmation is that there was a threatening. Well, yeah. In writing and verbally to me and others. And they actually came out, as I said earlier, and physically removed people on one occasion. So I'm way over my time. I'm happy to answer any other questions. We will hear from your adversary and we will hear back from you. Thank you very much. May it please the Court. There are a lot of issues that have been raised in this case. I'd like to start where we ended, with the discretionary function exception, because I really do think that is the most straightforward way to resolve all of the issues in this case. The discretionary function exception applies where there's no federal statute regulation or policy specifically prescribing a course of action for an employee to follow. Well, now your colleague says that 60 days there is no discretion. Sixty days, that comes down, and that's when the deal must be done. There is no discretion after that. Is that accurate? No, that's incorrect. Under federal law, the policy is to act properly, but the Forest Service Policy Handbook said that time is something to be negotiated. The logging regulations apply on their face and the road use regulations apply on their face, even when there is a right of access. Look at 223.12 for the logging regulation. And this discretionary function exception exists because tort actions are not the right place to challenge federal policy. The Supreme Court said in Varick Airlines, this Court said in Marando, Congress said it when they enacted the FTCA, it's designed to prevent challenges to decisions grounded in federal policy through the medium of tort. So if you think that these policies and regulations are inconsistent with state law or unlawful, the discretionary function exception says you can't challenge that with a tort action. You might be able to bring some kind of APA suit, but not a tort action. Their allegation is not that their regulations are ultra-various, for example. They're alleging that the service acted outside the scope of its authority. And you would agree as a matter of first principles that if the Forest Service were acting outside the scope of its authority in violation of federal law, that that could not fall within the discretionary function exception, right? If there is a clear directive in federal law, that's when you're talking about acting outside of the scope of the authority, as the Supreme Court said in Galbraith. We're nowhere near that here. Why aren't we in view? We're bound by Minard 3, right? And Minard 3 concluded quite explicitly that the notice to proceed could not be treated as a permit. You could not have threats of criminal action for proceeding with access to subsurface rights simply because a notice to proceed had not been issued. Why isn't that what this case, in its most basic terms, is about? Well, there are several things I'd like to say to that. One, of course, Minard 3 postdated all of the conduct at issue here, and this was an APA challenge about the Forest Service's understanding of NEPA. It really did not go to the question here about how quickly the Forest Service has to wrap up these negotiations. This is not a case, and if it were, again, that would be an EPA action, not an FTC action, where the Forest Service refused to negotiate at all. This is a case where the back and forth took a little bit longer. Now, after Minard 3... I take the claim not to be simply about the delay in time, but that as part of the background to the treatment of the notice to proceed as a precondition of moving forward with access to their mineral and gas rights. And the treatment of that notice to proceed, in effect, is a permit, which we said was, in Minard 3, regardless of NEPA and other issues that were relevant there that may not be relevant here, that treating the notice to proceed that way and making access to their property, their subsurface property, conditioned on the issuance of a notice to proceed with the threat of criminal sanctions, if they nonetheless went forward, that that was outside the scope of authority of the Forest Service. So there are three things that I'd like to say to that. One is that after Minard 3, there was a remand, and the Minard Run companies brought a contempt, tried to get the government held in contempt for not acting within 60 days. And the district court said, depending on the circumstances of any given case, a period of time longer than 60 days may be entirely appropriate and necessary in order for the dominant and subservient stakeholders to engage in meaningful accommodative effort. And that was especially true for their timber removal issues, as there are here. Remember, even back in 2000, when the things at issue in this lawsuit happened, 2007, 2008, that was the period of time when the district court Minard Run 2 praised the government for acting in a spirit of cooperation and resolving 90% to 95% of these requests for notices to proceed within the 60-day time period. There's never been a mandatory requirement that we act within 60 days. You keep going back to the question of the length of time. My question is going not to the length of time and the arguable discretion that there is there, but whether if the Forest Service is conditioning access on the issuance of a notice to proceed, threatening criminal sanctions for an entity to proceed in the absence of a notice to proceed, and even erecting physical barriers, as alleged in Counts 3 and 6 of the complaint, why isn't that just per se outside the authority of the Forest Service under Minard 3? So during Minard Run, I apologize, I'm going to go on to the letter. Minard Run did not look at the logging and road use issues that are present here. So in Minard Run, it was simply about the notice to proceed. Here, of course, by federal statute, they have to either sell us the timber or let us buy it on such terms or such advance notice as we accept prior to acting, and the regulations require advanced authorization. They require the Forest Service to mark the trees in advance. They require payment in advance, and those apply even when tree removal is necessary for the occupancy of a right-of-way or other authorized use of the National Forest System land. As to roads, like every other user of Forest Service roads, they have to pay a prorated share of the maintenance. They can build their own roads, but the subsurface estate doesn't give them the right to come in and do damage to the Forest Service roads. So the road use permit is a mechanism by which those costs are shared, and they are required to have a road use permit. So the blocking, in light of the complaint, it was where they hadn't paid for a road use permit and a road was blocked for four days. But 16 U.S.C., 537, 36 CFR, 212.5 C, and you see the specific policy for the Allegheny at S.A. 64, they require a road use permit. Now, if there's a problem with federal policy, federal regulations, the FCCA is simply not the mechanism to challenge that. Congress did not want challenges to federal policy through the medium of a tort action. Under Pennsylvania Supreme Court case law and what we've said in Winard, isn't the appropriate approach then for the serving estate, for the government surface estate, for the government to go in and seek to enjoin their actions, not to impose a physical barrier of blocking the road or bringing in law enforcement to threaten physical action, to threaten criminal action, if they move forward with removal of their mineral rights in the subsurface estate. So I do want to move on and talk about state law, because state law does not require this. But as a matter of discretionary function, it is irrelevant what is required by state law, what this court said in Minard 3 is required by state law. The discretionary function exception, it applies unless there's a mandatory directive in federal law. And of course, as I just laid out, the regulations relating to logging and road use permit criminal sanctions and arrests if the logging and road use procedures are not followed. And that really does resolve this case. But in terms of charged block whole, going all the way back to 1904, the Pennsylvania Supreme Court has recognized that these cases regarding disputes between the surface and the subsurface raise difficult questions regarding how to give each owner the enjoyment of his property or strata without impinging on the rights of other owners. And that's why the Pennsylvania Supreme Court did not import easement law into this context. The owner of the mineral rights does not have a roving commission to subject any part of the surface through occupation. Their rights have to be exercised with due regard to the owner of the surface, and that includes preventing unnecessary disturbance and selecting method and location. And as the Minard Run I court said when the government did go to court and seek an injunction, these things can't be determined unilaterally by the subsurface owner. The negotiation is required here. And there is nothing also in Pennsylvania state law, there's no statute that says these things have to be wrapped up in 60 days. The 60-day requirement came from the district court in Minard Run I when the United States got an injunction to stop action that you have to give the United States reasonable notice so this negotiation can happen, let's say 60 days. And since then, as the district court in Minard II, although of course that postdated everything here, praised us for what was happening in 2007, 2008 when we were issuing 90 to 95% of these within 60 days and acting in a spirit of cooperation. Now, of course, their position is, they acknowledge they have to negotiate, but their position is that after 60 days they can go in and do whatever they want. The implication of that is that somebody could stonewall for 60 days and then go in and start cutting down trees in a national forest without permission. That's where under the Minard line of cases, the onus is on, and under Pennsylvania Supreme Court case law, the onus is on the Forest Service to seek an injunction, not to impose physical barriers or to threaten criminal action where our law and Pennsylvania law seems clear that consent by the service owner is not required before the subsurface rights holder enters the property. So Minard III did not address road use and logging where there are very specific regulations on point. They didn't make any decisions there. But it really is critical that for the discretionary and function exception, state law is irrelevant. The question the Supreme Court said in Berkovits, this court said in Abinavit, is whether there is a federal statute, regulation, or policy specifically prescribing a course of action for the employee to follow. As this court said in Penn Bank... I'm not sure that I heard an answer to Judge Krause's question. What do you think was meant in Minard III where the court said that you don't need a permit or the notice to proceed is not a permit? How do we deal with that? I'm not sure that you've answered that question. Sure. I think that's a limited application here where there were issues regarding logging and road use that weren't addressed. I understand that. So from the discretionary function perspective, it's irrelevant because that was an interpretation of state law. Since Minard III, we've been operating with the understanding that the notice to proceed is something that is issued at the end of a negotiation and memorializes the terms of the negotiation. Operators want them because then they know that they're not going to get hauled into court in a suit for an injunction like happened in the first Minard run litigation back in the 80s. But we don't, for purposes of the discretionary function exception, that is simply not relevant. Because when we're talking about discretionary function exception to the FTCA, there's always a claim of some violation of state law. That's why there's a tort. And this court said in Penbank, you don't consider whether there's a duty owed or whether the duty was breached in looking at the discretionary function exception. And, of course, Congress was really clear that federal policy cannot be challenged through an action in tort. That's not what the FTCA is for. Is it your position that the Forest Service has authority to threaten criminal action for a subsurface owner who proceeds in the absence of the issuance of a notice to proceed? Federal policy as it existed at the time of this case in 2007-2008 absolutely permitted that. Absolutely permitted it. That is arguing something like a good faith exception or a clearly established doctrine, which we can come back to. But is that the case as of now? With Miner 3 in place and with what was pronounced there, is it your position nonetheless that the Forest Service has within its authority to threaten criminal action for a subsurface owner who proceeds in the absence of a notice to proceed? So they don't need a notice to proceed. They do need to follow the statute and regulations regarding logging and road use. And you cannot cut down trees even when the regulation says even when you have an authorized use or right-of-way. You cannot cut down trees in a national forest without the forest officer first marking them. That's 30 CFR 261.6B. Providing advanced authorization, that's 261.6A and H, without payment in advance, that's 223.34. And I do think that the statute applying specifically to the Allegheny National Forest, 30 U.S.C. 226.04, acknowledges that these timber issues need to be worked out. That either they let us sell it or they buy it from us before moving forward. Is it within the Forest Service scope of authority to refuse to negotiate those terms? There could be an ATA suit for agency action unlawfully withheld. I wouldn't want to say that such a suit would prevail, that the plaintiff would prevail in such a suit. But that's not an FCCA case because what we're talking about here is a challenge to federal law regulations policy. The fact that they conflict with state law, if they did, would not get you around the discretionary function exception. What they've alleged goes beyond simply timing or prices or the back and forth that might go on around particular fees. It's that as to access and as to timber prices or the disposition of that timber, that the Forest Service acted in bad faith and simply refused to engage in negotiations. Wouldn't proceed under either sub A or sub B even though they gave the Forest Service the option to permit the Forest Service to purchase the timber. Why would that be within the discretion of the Forest Service when we're taking the complaint at face value and they've alleged the Forest Service is refusing to comply with its duties under federal law? This court addressed the bad faith argument, for example, in Bayer. The fact that the government even acts in bad faith doesn't get you around the discretionary function exception. If it's susceptible to policy analysis, if these questions about which trees are going to be marked, where the wells are going to be located, how we're going to preserve the watershed, how we're going to handle these negotiations are susceptible to policy analysis. As this court said in Bayer, subjective good faith, bad faith is not relevant. And that is consistent, of course, with the Supreme Court's decision and with the language in, say, Berkovitz and Gaubert, that whether the discretion is abused is not relevant to the discretionary function exception. Well, why isn't this just bootstrapping us back to the same position as the Forest Service took in Minard 3? That's to say, we said in Minard 3 that the Forest Service does not have broad authority claims over private mineral right owners' access to surface lands. Its special use regulations do not apply to outstanding rights and the limited regulatory scheme applicable to the vast majority of reserved rights in the forest does not impose a permit requirement. And that the Forest Service approval is not required for surface access. A notice to proceed is simply an acknowledgment of an agreement. In other words, they could not condition moving forward on the issuance of a notice to proceed. You're now saying, well, they can condition the precursors to the issuance of a notice to proceed. They can make those things, as a matter of their discretion, conditions of access. Doesn't that bring us to exactly the same place that we said in Minard 3 was outside the authority of the Forest Service to prevent that subsurface holders' access based on insertion of the ability to regulate? Even if it is outside of the authority of the Forest Service, that is a service that is irrelevant for purposes of the discretionary function exception. If it's outside the authority of the Forest Service? Under state law. Even if it violates state law, that's not relevant for purposes of the discretionary function exception. Were we talking about state law in Minard 3? In the understanding of the significance of the notice to proceed, that was a state law analysis. The implications of that for NEPA, of course, go to federal law. But the implications of the notice to proceed is a state law analysis that discussed cases like charters, block coal, and Belden. This is a question of state law, what the significance is of the notice to proceed and what the property rights are. So, yes, it's not relevant for the discretionary function exception. As a matter of federal law, the Forest Service acts within its authority by preventing someone, physically preventing them or threatening criminal action, if the mineral holder seeks to access their mineral rights in the absence of a notice to proceed. That's not the way we have proceeded after Minard 3. But their claim that after 60 days they get to go on Forest Service land and do anything they want, that is not something that anything binding under federal law would have told the Forest Service couldn't happen back in 2007 or today. And, yes, we have federal policies that say the notice to proceed is to be negotiated. And the time for issuing the notice to proceed is an issue for negotiation. But I do also want to address the point. There are cases where perhaps somebody can drill without cutting down valuable trees, without, you know, maybe they have a road use permit because everybody is required to get them. Maybe they don't need to use Forest Service roads. So in those situations, you can go forward without a notice to proceed. Here, the sticking points were logging and road use. And there are these very specific federal regulatory schemes that apply and apply even when there is a right of access. You've made reference a couple times to the law not being clear or not being in place in terms of scope of authority before Minard 2 or 3. What is your authority that there is some kind of good faith exception or requirement that the law be clearly established? If the federal courts hold that action by the federal government is outside of its authority, why is there anything like a good faith exception come into play there? And I ask this in the context of a Supreme Court case, Owen v. City of Independence, Missouri, as well as the D.C. Circuit case, Lumiel v. United States, which you may or may not be familiar with. But those seem to suggest that when the question is did the federal government act outside scope of its authority, that that is fundamentally different from and does not permit consideration of something like a good faith exception because then it's not a matter of policy or discretion. It's the courts making an assessment of whether the government has acted within the law or not. I don't have authority for the fact that it predated. But I do think that it is very important to remember that when we're talking about discretionary function and when we're talking about what is required by federal law, there was no requirement in federal law. There still isn't. And after Minard 1.3, of course, the district court said there is still, depending on the circumstances of a given case, a period longer than 60 days may be entirely appropriate and necessary. So there's no requirement in federal law. Minard 1.3 is interpreting state law, which is not relevant to the discretionary function. Even there, there is no requirement. I would like to answer the questions that the court raised. Is the government even pressing the economic loss doctrine at this point? The economic loss doctrine in this case does survive Dittman because Dittman says economic loss doctrine still exists for cases that arise in contract. And this is a case that arises in contract just like Aikens. So footnote 22 of Dittman talks about Aikens and restatement of tort section 776C, which says there's no tort liability for interference with the ability to carry out or make a contract. And that's true. And the contract here is what? There are two alleged contracts. One is the contract that they had to renegotiate because they didn't start drilling early enough, and the other are the future advantageous sales contracts. So in Aikens, remember, this is a case where a railroad, a train derailed and destroyed the employee's workplace, and they brought suit against the railroad. And the court said, no, this really arises out of your employment contract. You're not making any money anymore because you have your workplace. That's about your employment contract. The same thing is true when we think about arises under contract under the contract exception to the FTCA. In Small, we had a dentist who was erroneously called up for the Army Reserve, lost money because he was not able to see patients during that time, and the court said, no, that arises out of contract, your contract with your clients. And in Dupree, same thing, somebody who wasn't able to work for a third party because the government has held a security clearance. He said, no, that arises out of contract. You're not able to get employment. These cases really arise out of contract. Of course, as the court has raised the injury or loss of property component of the FTCA would also, we think the best reading stand as a bar. Of course, there is a circuit split here, and the court doesn't need to get into this, but we do think that Ninth Circuit's position is the better one. The statute says injury or loss of property, personal injury or death. If it meant any legal injury, they wouldn't need that whole list. This is a statute that came out of motor vehicle accidents, and it's no accident that that list is here. But, of course, most claims that are barred under this provision are also barred under some other FTCA provision here. There's the contract exception and, of course, the discretionary function. If it meant in terms of the injury or loss of property, there would not be a cognizable claim for economic loss involving consequential to the property right denial. Why would there be a need for the interference with contract exception? There's nothing that prevents Congress from coming up with belt and suspenders statutes. I don't know all of the contract claims that somebody could come up with. Maybe somebody has a – I really don't know what things people might allege. That carve-out would seem to be superfluous if it weren't already covered by the terms of money damages for injury or loss of property. Well, you could have a contract case that raises a loss of property question, for sure. So you might need the contract exception in that circumstance. Gitman seems to direct us back to the duty, the source of the duty, and the relationship between the parties. So it's not just interference with some future contract with a third party, but looking at whether there is a contractual relationship between the two parties at issue. Do you disagree with that reading? And if not, what is the source of a contractual relationship here between the government and DURING? We're not relying on a contractual relationship between the government and DURING. I think that while the court in Gitman talks about duty, it also in Footnote 22 leaves in place Aikens and its embrace of 776C. So that is where this arises in contracts for those purposes. But the key here in terms of the state law analysis, and when you start thinking about duty, is that in over 100 years of Pennsylvania cases balancing the rights of the owners of different strata, there has simply never been a case where somebody got damages for lost profits because they were delayed in accessing their strata. And I think there are at least three different ways to think about this. One is the economic loss doctrine. Another is that this is a context, as the Pennsylvania Supreme Court said in Charter's Black Hole, where there are these very difficult questions that do need to be addressed through negotiation and that this is not like an easement where the rights are clear and everybody knows what they can do. There are very complicated things here, and it can take some time to work out. The third reason is, as the court pointed out in its order, the weight of authority in Pennsylvania law, even for a complete deprivation, temporary deprivation of property, the damages would only be the lost rental value. Now, escrow is the one case that I found that seems to go against that, but the trial court said that and then the defendant waived an appeal on the profits issue. And I think under Pennsylvania law, that's specifically true for a mine, as the Pennsylvania Supreme Court said, for mineral rights, we're talking about the profit that may be made from a mine, the imagination, I'm quoting, may indulge in visions as glittering as the caves of Aladdin. So this is really a circumstance in which the state courts have never recognized a cause of action for lost profits. If there are no further questions, I know I'm way over my time. I have some further questions, and perhaps my colleagues do as well. So you refer to this as something different than an easement, but in Minard 3 and in Belden v. Blake, the Pennsylvania Supreme Court seemed to treat this as an actionable claim for interference with easement, interference with access to subsurface rights. So isn't it something we should deem as cognizable under state law, as a tort under state law? So there's a claim in the court of equity, and I don't think it's an accident that these cases get worked out in equity in the absence of complete destruction of the minerals, because as the Pennsylvania Supreme Court said, insurers, we have to balance the rights of these different strata, and that's not something unlike the easement case, where you know exactly what the easement is. When we're talking about balancing the rights of the different strata, that is not something that we know the answer. There has to be, as the court said in Minard 1, a negotiation, a back and forth. The mineral rights owner can't unilaterally determine what is going to have the least impact on the surface owner. Is the burden on you as the government to initiate injunctive relief? After Minard 1-3, as a matter of state law, if there are no logging or road use issues, it may very well be on us as a matter of state law to seek injunctive relief, but there has never been a case where for a temporary deprivation of access, somebody got damages. So even if the best interpretation of state law is that we should go to court and seek an injunction instead of trying to enforce our longstanding regulations about logging and road use, even if that is the best interpretation of the law, there still wouldn't be money damages as a matter of Pennsylvania law. And of course, we wouldn't get around the destruction and function exception, because what we're talking about here is state law. We allow for damages for temporary taking on facts almost exactly like this, right? I mean, that's UVA. Why isn't looking at it as a claim where, I mean, the question of the extent of damages and how to calculate damages and something that may be the subject of an expert testimony report is different than whether there is a cause of action for damages. Why isn't, given Rob and that deep case that we cited you to and the analogy to temporary taking, why isn't it a cognizable claim for damages, perhaps damages that are limited to rental value for the temporary period of loss of access? So never in Pennsylvania law has there been a claim like this for damages. If this is not a taking, they still have the mineral rights. But even if it were a temporary taking, as the court points out, they would have to be in the court of federal claims. That's an entirely different claim. And they wouldn't get lost profits, which is what they're seeking here. I believe my friend at the bar said that rental value here is not worth anything. So this is a situation in which, for very good reason, the Pennsylvania courts have never held a private party accountable. And under the FDCA, if a private party is not liable in tort, then the federal government certainly isn't either. Why isn't that on all fours with Rob and Deep? Those cases were not disputes about how to do this negotiation between the surface and the... They were temporary interference with access to property. They're cases involving an impairment of servitude and damages for a temporary loss to the Pennsylvania Supreme Court said were to be calculated by the lost rental value of the property for that period. We look at what plaintiff asks for. We look at plaintiff's complaint, of course, and the complaint here is not for the lost rental value. They're asking for the money that they could have made, the money they lost from negotiating a contract, which gets us back to the fact that this really arises in contract, that just like Small and Dupree, they're seeking damages for something that really came out of their inability to make advantageous contracts in the future. You agree that the fact that a claim could be brought as a contract claim or a conversion claim, it doesn't change the fact that it was brought as a tort claim if it meets the elements of the tort, right? But it doesn't meet the elements of the tort, and that's no accident. We look at their complaint, and what they're asking for really does arise in contract. As the court pointed out, you can't plead around this arising out of contract exception. Well, we cited you to ALUCA, and that's a case where we said that a claim is still cognizable under the FGCA, even though it could have been brought in the court of federal claims, right? I mean, the fact that it could be brought, it could have been characterized differently, should we conclude that even though we said in ALUCA it does not deprive us of jurisdiction, the fact that there would be exclusive jurisdiction if it was characterized as a contract claim, that we should nonetheless convert it into an interference with contract claim essentially depriving ourselves of jurisdiction. I refer the court back to Small and Dupree, which are very, very similar to the fact of this case, where in that, in many ways they're not similar, but they're similar in that the complaint in both of those cases was the federal government did something that cost me this advantageous future contract. And in both cases, those were covered by the contract exception. Now, however the court wants to look at it, there really is no accident that for the last hundred years there has not been a case with damages for a temporary destruction where there was no temporary, I'm sorry, temporary interference with access where there was no destruction of any of the resources. If there are no further questions, I ask the court to apply. Thank you. Hello again. Mr. Wilford, can you begin by addressing the particular regulations that were cited as to logging road use? So I think your comment about bootstrapping is an accurate one. Here's the problem. The United States of America doesn't create regulations for the Allegheny National Forest. They create regulations for every forest in the country. And so if I want to go cut down some timber in some national forest, I have to follow the regulations. That's what a lot of timber clearers do. So they have to follow the regulations. If I want to develop oil and gas reserves that are federally owned, then I have to follow their regulations because they own the oil and gas and so that's their regulations. What Minor Grun said is that under the WEEKS Act, and this is a WEEKS Act case, and they rejected Duncan Energy specifically for this reason. They said when these lands were acquired as outstanding, no regulations apply. And if they acquired them by reserve, and between those two it accounts for about 95 percent, and the ones here are both outstanding and reserved. The only regulations that apply are the ones that are in the deed. That's it. And so this idea that we can say, well, the reason that the federal government had the authority to arrest these people is because they violated regulations that clearly did not apply, is just baseless. And the idea that, well, Minor Grun hadn't been decided yet also fails because if you go back and look at their manual and their handbook, they knew all this. Are you saying that the road use and the timber logging, you had no need to concern yourself with this at all? We don't have to follow the regulations. The need to concern ourselves with it is part of the 60-day negotiation period. We put them on notice. Here's what we're planning to do. At the end of the 60 days, no agreement was reached. And the federal government has an obligation to go to court. All right, and the federal government didn't go to court, and then what happened? Regulations don't apply. And you sat there, but you could have gone to court also. But that's not the law. The law says that it's the surface estate owner that has that onus. And it's not like this is coming out of the blue. Where does it say that after 60 days, the federal – pardon me? Belden and Blake. It's a Pennsylvania Supreme Court case in a government context. And that is binding on the federal government. Well, no, that was the argument in Minard Run 3. And this really gets to your other question. No, but we're not in Minard Run 3 in 2007. Well, actually, if you're concerned about timing, Belden and Blake actually came out, I think, in 2009. So that did not exist. But Chartier's has been around for 100 years, and they said there, a court of equity makes this decision. But you're saying that's controlling on the federal government? Yes, that's what Minard Run 3 said. Well, okay, we're talking – And I think that gets to – That's not really what Minard 3 did. I mean, Minard 3 was not – that was not the issue in Minard Run 3. In Minard Run 3, there's no federal APA action unless the state law provides for certain things. The linchpin of the case was about Chartier's, Belden and Blake, all of those cases that says that the subsurface owner has a right to go on the property without interference by the surface owner. They don't have a veto power. They don't have conditioning power like regulations. They just don't have those powers. The federal government, in this case, knew that. They didn't need to wait for Minard Run 3. Minard Run 3 basically affirmed what we already knew. They made an argument about the property clause. What Belden and Blake was about, Belden and Blake said, look, we know what the law is for everybody else, but we're the government. We're different. These are public lands. We don't have to follow the same rules. Constituent Supreme Court said that's laudable, but that's not the law. You're a surface owner. You have to follow the law. Minard Run 3 was the same thing in a federal context, slightly different arguments, but it was the same thing. We're the federal government. These are public resources. We don't have to follow Pennsylvania law anymore, even though they knew back in 1980 that they did. That's why they brought the action against Minard Run in Minard Run 1. Is it your position that you do not have to pay any road use fees? Yes. None at all? You can use the roads? You can use them to an unlimited capacity without paying anything? What has worked out as a matter of policy is that there are certain maintenance costs that any road has. And so just as a matter of being a reasonable surface user, they will share their burden of that. But you can't condition whether or not they can come on the surface by saying, you owe us this much road fee and you didn't pay it. You send them a bill, I suppose. They usually work out these issues by negotiating. That's part of what happens during the 60-day period. But I don't think they can arrest them for going on the road to get access to their wells because they didn't pay a road fee. Could you cut a new road on the 61st day? Yes. That they think is unnecessary or may be in some other area? Yes. That's what the accommodation period is about. And mind you, it's not like they just show up on day 61 and say, hey, we're here, we're going to start bulldozing everything. What happens is when they submit the plan of operations post minor run 1, 1980, there's five things that are included. They have to show we own these rights. Here's what our plan is. So they go out and they mark them. We're going to cut down this tree. We're going to cut down this tree. We're going to use this road. There is no road over here, so we're going to do an access road over here. So the Forest Service has all this information before the 60 days even starts. And that was one of the issues that came up in the contempt case is they were saying, well, we've got four out of the five pieces of information, so it didn't really start yet, that sort of thing. But they have all this information. And so if they don't like the plan, and they usually meet in the field too. These are all knowledgeable people. And if they say, for example, well, we don't want it here. How about putting it over here? That's usually fine. Because what was happening here is that they just basically said, you know, we're reviewing your plan. You can't go out. If you go out, we're going to arrest you. That's what the case is about. And as regards to 60 days, I mentioned earlier about – You suggested earlier that the Forest Service was negotiating and referred to those negotiations as a matter of policy, which would seem to take us straight into the realm of discretionary function exception. To the extent there's negotiations, they're on both sides. And if the gas and mineral owners also have believed themselves even to date to engage in negotiation concerning, for example, the fees for accessing the roads or logging, then why aren't we in the realm of policy and the discretionary function exception? Because at the end of the day, they don't have the discretion to make them do anything. All they're doing is asking. And the case law is very clear on that. So mineral gas companies are engaging in negotiations about fees for road access just out of the goodness of their hearts? No, they're doing it in good faith. They're doing it in good faith. This has been going on for decades. They've always done it in good faith until 2007 when the Forest Service decided to change the rules. That's what this case is about. This isn't about when everybody's cooperating. This is about what happens when the service owner decides you're not coming on the property anymore and we're coming up with this reason and this reason and that reason and the other reason. And we don't really care about this whole 60-day business. And so here's what Judge McLaughlin said about the 60 days. We have previously cautioned that forbearance on the part of mineral owners beyond the initial 60-day period, while not legally required, may be practically advisable in order to exercise appropriate due regard for the Forest Service's state. I think that's what you're saying. We also stress, however, that the Forest Service's processing of drilling proposals consistent with Minard Run 1 paradigm and our directive in Minard Run 2 should not be viewed by the Forest Service as merely an aspirational goal. It is required. Unreasonable delay by the Forest Service beyond the 60-day period increases the likelihood that mineral owners will simply choose, as would be their right, to commence drilling activities prior to the completion of the interactive process. As a result, in the absence of filing its own lawsuit, the Forest Service could lose the ability with respect to any given well package to supply meaningful input concerning issues it considers important to preserving the integrity of its survey in the state. That's the law. And so if it doesn't like what's going on at the end of the 60-day period, even if, hey, we haven't had enough time, which in most cases, if that's what was going on, they would have been given extensions. But they didn't ask for extensions. They said they're not going to ask. And it was all part of a grand scheme which led to the drilling. Even assuming you're right that the Forest Service could have and perhaps should have gone to court first in view of the impasse that was reached in negotiations, isn't that also within the power of the gas and mineral rights holder? That is, you could get declaratory relief and injunctive relief to gain access. And while you may not need to do that, the question for us is not whether in equity you would prevail, but whether under, as to this issue, under the Federal Tort Claims Act, discretionary function exception comes into play because you're in a realm of subject matter that is the subject of negotiation between the parties. Well, the good faith part only lasts for 60 days. After that, there is no good faith negotiation. And it's not policy. I briefed this in the reply brief. These aren't policy decisions. These are land management decisions. Like put this here, put that there. They're not policy decisions. That was actually a New Jersey District Court case that I cited. You're saying a land management decision because it has to do with land and management? It's not a matter of policy? I mean, policy decisions really are more judgment calls. I'm saying these types of decisions that have no weight of discretionary authority, they can't say you have to put it over here. They're just looking at here and there and asking. They're judgments that are being made, correct? And isn't it when there are judgments, then that's? They're making determinations on what they want. Okay. Judgments. That's not a policy question. But policy has been defined fairly broadly in the discretionary function realm. As I said, I did cite a case where a land management decision similar to this one, the District Court concluded that doesn't really involve a policy decision. And I would also mention that this has been previously litigated, which is something that you asked. Don't we just get back to Minor Round 3 on a lot of these issues? Yes, we've raised that. We think there is issue preclusion on, for example, whether or not they had the discretion to deny access after 60 days. The answer is no, and that was litigated. And so it's nice that they want to litigate it again, but we've already litigated it, and it should be dispositive at this point. Another issue that I wanted to just touch on is this measure of damages discussion. Give you just a moment to wrap up. Yes, okay. On the measure of damages discussion, that's non-jurisdictional. To the extent that it's this damage or that damage or the other damage, if there is a damage, then the court needs to remand, because what you're saying is there's a cause of action for damages, which is what the District Court dismissed the case on. I would commend you to read Escrow and Hillsdale, because I think there is Pennsylvania precedent for this type of situation for lost profits for delay accessing minerals. Both of those cases, I think, stand for that proposition. And I'll just finish by saying, you know, I'm a former DEP lawyer. What I usually do is deal with oil and gas regulations and that sort of thing, which there's an overlay here that we haven't even discussed. So the real regulatory agency is DEP. It's not the Forest Service. They're a landowner. And so a lot of the issues that the Forest Service is concerned about are actually being addressed in an entirely different regulatory context. So I got pulled into this case because Miner Run Oil Company is a client of mine. And this thing came up. And all of a sudden, they're going to destroy an industry. And they really did try to destroy the conventional oil and gas industry by delaying for years. I mean, people were being laid off. If you go back and read some of the Miner Run testimony from the various people that came in, this was awful. They came right after the so-called Great Recession. And they knew what they were doing, because the Martin Statement showed that they knew what they were doing, is that this was going to have a bad economic impact on people. I think Pennsylvania law recognizes that if you knowingly do something that's going to have an adverse economic impact on somebody, number one, under tort you get to be made whole. And number two, you ought to have a financial disincentive for behaving in that way. I think Pennsylvania law recognizes both of those things. And they should be recognized under the FTCA. We thank counsel for their excellent arguments. And we will get back to you regarding supplemental briefing. Thank you very much.